UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 UNITED STATES OF AMERICA,

                    -against-                    **MEMORANDUM & ORDER**
                                                    21-CR-572 (EK)
 CHARLES POWELL, BRIAN CASTRO, and
 MUSAH COWARD,

                     Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          A jury convicted Charles Powell, Brian Castro, and

Musah Coward of conspiring to commit (and committing) a robbery

at an illegal gambling parlor in Brooklyn; unlawful use and

possession of a firearm; and causing death through use of a

firearm.  The jury also convicted Powell of being a felon in

possession of ammunition.

          After trial, each defendant moved for a judgment of

acquittal under Federal Rule of Criminal Procedure 29 and / or a

new trial under Rule 33.  For the reasons set forth below, those

motions are denied.

                    **I.    The Rule 29 Motions**

          A defendant may move for a judgment of acquittal on

"any offense for which the evidence is insufficient to sustain a

conviction."  Fed. R. Crim. P. 29(a).  The standard of review on

a Rule 29 motion is "exceedingly deferential" to the government.

*United States v. Gahagen*, 44 F.4th 99, 108 (2d Cir. 2022).[1]  A court must review the evidence in the light most favorable to the government.  *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021).  And the motion must be denied if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*

## A.    The Evidence Was Sufficient to Prove a Robbery Occurred

Powell and Coward first argue that the government produced insufficient evidence that a robbery occurred.  *See* Powell Rule 29 Mot. 4-5, 10-11, ECF No. 328; Coward Ltr. Joining Rule 29 Mots., ECF No. 330.[2]  One element of a Hobbs Act robbery, as articulated in the Court's instructions to the jury, is that the defendants "knowingly obtained or took the property of an individual or business."  Tr. 2023:17-18.  In Powell and Coward's view, the only evidence that the conspirators actually stole any property came from the testimony of Shamel Myhand, a cooperating witness and the fourth and final co-conspirator.  Myhand testified that he stole $1,200 from a woman he believed was managing the gambling parlor.  Powell Rule 29 Mot. 10; *see also* Tr. 382:15-18, 391:3-9.  Because Myhand was a cooperating

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

[2] Page numbers in citations to transcripts and briefs refer to internal, rather than ECF, pagination.

government witness, Powell and Coward argue that his testimony was "inherently suspect" and therefore insufficient to sustain a conviction.  Powell Rule 29 Mot. 10.

This argument is meritless for two independent reasons.  First, "the testimony of a single, uncorroborated witness is generally sufficient to support a conviction," even when that witness is "potentially biased." *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004).  Second, the defendants' underlying premise is flawed: there *was* other evidence of property theft in the trial record, such as the recording of a conversation that Castro had with a cooperating witness.[3]  In that conversation, which the government played for the jury, Castro said that the defendants stole over $20,000 from the gambling parlor.  *See* GX 251-R, 251-T-A, at 2; *see also* GX 52-1 (surveillance footage showing patrons fleeing); GX 426-27 (photo of crime scene showing no money left on the gambling table).  Thus, the jury was not merely relying on uncorroborated accomplice testimony — it was relying on (at the very least) the independent, inculpatory statements of two of the four robbers.

---

[3] It is also worth noting that while Myhand's testimony about stealing $1,200 was not separately corroborated, other parts of his testimony were. For example, Myhand's description of his fight with the parlor's bouncer matched the fight depicted in the parlor's surveillance footage.  *Compare* Tr. 378:3-380:2 (testimony), *with* GX 81-2 (video footage).

**B.    The Evidence Was Sufficient to Show that the Robbery Affected Interstate Commerce**

The defendants next argue that the evidence was insufficient to show that the robbery affected interstate commerce.  Castro Rule 29 Mot. 4-6,[4] ECF No. 290; *see also* Coward Ltr. Joining Rule 29 Mots.; Powell Rule 29 Mot. 2-9.  This argument fails too.

To obtain a conviction for Hobbs Act robbery, 18 U.S.C. 1951, the government must show at least a "*de minimis* impact on interstate commerce."  *United States v. Elias*, 285 F.3d 183, 188 (2d Cir. 2002).  The government proves such an impact:

> (i) where the victim directly participated in interstate commerce; (ii) where the defendant targeted the victim because of her status as an employee at a company participating in interstate commerce; (iii) where the assets of a company engaged in interstate commerce were, or would have been, depleted as a result of the harm or potential harm . . . to the individual victim; or (iv) where the defendant targeted the assets of a business engaged in interstate commerce . . . .

*United States v. Orelien*, 119 F.4th 217, 224 (2d Cir. 2024).

---

[4] Castro's counsel stated on the record that his Rule 29 motion was "general" and "not limited to the points in the filing that was just made for the aid of the Court's analysis."  Tr. 1743:3-7.  But a defendant cannot satisfy his "heavy burden" on a Rule 29 motion as to arguments he has not even made.  *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017).  Castro's counsel did make a constructive-amendment argument during trial.  *See, e.g.*, Tr. 851:10-852:10.  And the Court, while expressing skepticism, indicated that was an issue more properly addressed in post-trial briefing.  *See id.* at 1140:20-1148:11; 1431:8-1432:9.  But counsel failed to press it.  In any event, the argument was without merit.

Here, the government presented sufficient evidence of
at least two theories of impact: (1) the robbery *depleted the
assets* of a business engaged in interstate commerce;[5] and (2) the
robbery *disrupted the operations* of a business operating in
interstate commerce.[6]  Because both theories are predicated on
there being a business engaged in interstate commerce at the
site of the robbery — and the defendants dispute the existence
of such a business — the Court addresses that evidence first.

1.    A reasonable jury could find that the parlor was
      a business operating in interstate commerce

The defendants make two preliminary arguments.  They
assert that (1) there was no evidence that the gambling parlor
was a business of any kind, *see* Powell Rule 29 Mot. 2-4; and (2)
there was no evidence that the parlor (if it was a business)
operated in interstate commerce.  *See id.* at 5-9; *see generally*
Castro Rule 29 Mot.  Neither argument has merit.

We begin with Powell's claim that there was
insufficient evidence showing the gambling parlor was a business

_____

[5] The Court uses the term "interstate commerce" to refer to any commerce
over which the United States has jurisdiction.  The Hobbs Act does not
distinguish between interstate and foreign commerce.  *See* 18 U.S.C.
1951(b)(3) ("The term 'commerce' means commerce within the District of
Columbia, or any Territory or Possession of the United States; all commerce
between any point in a State, Territory, Possession, or the District of
Columbia and any point outside thereof; all commerce between points within
the same State through any place outside such State; and all other commerce
over which the United States has jurisdiction.").

[6] The government also argues that it presented sufficient evidence that
the defendants targeted the assets of a business engaged in interstate
commerce.  Gov't Opp. 33-34, ECF No. 335.  Because the Court declined to
instruct the jury on that prong of *Orelien*, Tr. 1464:10-1465:18, it does not
address that argument here.

at all.  Myhand testified that he had been to the parlor ten
times before, and that he frequently saw patrons betting on
table games.  Tr. 371:1-372:14.  He also testified that "weed"
and "alcohol [*sic*] beverages" were sold in the "kitchen area,"
*id.* at 367:20-21, testimony corroborated by crime scene photos
showing stacks of individually wrapped snacks and alcoholic
beverages in the parlor's kitchen.  GX 416-3 through -5.  And he
described a managerial structure and protocols that suggested
the gambling parlor was a commercial endeavor: security guards,
a woman who was "running control" (*i.e.*, managing the
operation), and a screening system whereby gamblers had to
present a "link" on their phones before entering.  Tr. 374:24-
375:1, 376:21-24, 382:17.  This evidence would have permitted a
reasonable jury to conclude that the parlor was a business.[7]

Equally unpersuasive is the argument that there was
insufficient evidence to suggest the parlor engaged with or
affected interstate commerce.  The defendants' basic claim is
that the government never established that the gambling parlor
was engaged in interstate commerce *at the time of the robbery*.
Powell Rule 29 Mot. 8; *see also* Castro Rule 29 Mot. 5.  In

---

[7] Powell further argues that the government did not show that the parlor
was an "illegal gambling business" within the meaning of 18 U.S.C. § 1955.
Powell Rule 29 Mot. 3.  But the government had no obligation to satisfy the
elements of Section 1955, because it was not prosecuting the business or its
proprietors under that Section.  The government only had to adduce evidence
that would permit a reasonable jury to conclude that the gambling parlor was
a business operating in interstate commerce.  It did so.

particular, the defendants dispute the relevancy of Myhand's testimony that he and others had purchased Heineken beer at the gambling parlor in the past. *See* Tr. 372:15-24, 409:24-411:9. But combined with photographs showing that bottles of Heineken and Casamigos tequila — both of which are brewed and bottled abroad, *see* Tr. 981:22-983:3, 1030:14-1031:8 — were in the gambling parlor's kitchen on the night of the robbery, GX 416-3 through -5, a rational trier of fact could infer that the gambling parlor purchased those beverages for resale to customers, and was thereby participating in interstate commerce.[8] *See United States v. Needham*, 604 F.3d 673, 682 (2d Cir. 2010), *abrogated on other grounds by Taylor v. United States*, 579 U.S. 301 (2016) ("In Hobbs Act cases, an interstate nexus may be demonstrated where the government introduces evidence that the robbery was of a business (legal or illegal) that . . . purchases a commodity that travels in interstate commerce[.]").

---

[8] Castro alternatively suggests that an individual patron could have been selling these items, that they may have belonged to the owner of the house, or that prior sales could have been one-off transactions. Castro Rule 29 Mot. 5. But he does not persuasively explain how *no* rational trier of fact could conclude that the parlor sold these items to customers as a matter of course. If anything, Castro's proffered interpretations of the trial evidence are *less* plausible than the government's. For instance, one struggles to imagine a gambling operation (legitimate or otherwise) that would permit outside merchants to hawk merchandise to patrons and keep the resulting profits.

2.    A reasonable jury could have found that the
robbery *actually affected* interstate commerce

A reasonable jury could further conclude that the defendants' robbery of the gambling parlor interfered with interstate commerce in at least two ways.

*First*, there was sufficient evidence to find that the robbery depleted the business's assets. *Orelien*, 119 F.4th at 224. Under a depletion-of-assets theory, "a robbery of a local . . . retail enterprise may be said to affect interstate commerce if the robbery impairs the ability of the local enterprise to acquire . . . goods originating out-of-state" going forward. *United States v. Elias*, 285 F.3d 183, 189 (2d Cir. 2004) (finding interstate commerce was affected because grocery store sold beer and fruit that originated out-of-state). Here, Myhand testified that he stole $1,200 from a woman who he believed was a manager of the business. Tr. 382:15-18, 391:3-9. And there is evidence that the business purchased goods from outside New York, such as Heineken beer. *E.g.*, GX 416-3 through -5. So, a reasonable jury could find that the robbery impaired the business's ability to purchase goods originating from out of state. *Elias*, 285 F.3d at 189; *see also United States v. Mapp*, 170 F.3d 328, 336 n.13 (finding sufficient evidence of effect on interstate commerce because robbed business "sold goods that had been manufactured in [other states] and Holland").

Powell argues that there is no evidence the stolen money belonged to the business rather than the woman herself. Powell Rule 29 Mot. 4.  But even absent evidence regarding the specific source(s) of the money in her possession, "a rational juror could have inferred that . . . at least some of the money [the victim] was carrying at the time of the hold up would have been used to purchase out-of-state supplies for [the] business." *United States v. Wilkerson*, 361 F.3d 717, 731-32 (2d Cir. 2004).

*Second*, there was sufficient evidence that the robbery caused a prolonged disruption of the gambling parlor's business, thereby preventing it from selling goods it had purchased in interstate commerce.  The gambling parlor shut down for at least 48 hours following the robbery to allow the NYPD to respond to, secure, and investigate the crime scene.  Tr. 152:25-152:5.  The likelihood of lost revenue during that closure also tended to demonstrate a *de minimis* effect on interstate commerce.  *See United States v. Suggs*, 14 Fed. App'x 54, 56-57 (2d Cir. 2001) (closure of store for "three to four hours while the robbery was investigated," resulting in loss of "several hundred dollars in sales," was sufficient to demonstrate effect on interstate commerce because the store sold products manufactured out of state).

**C.   The Evidence Was Sufficient to Show Powell Was a Felon in Possession of Ammunition**

Finally, Powell argues that there was insufficient evidence tying him to the three .380 caliber cartridges alleged in Count Five of the indictment (Felon in Possession of Ammunition).  Powell Rule 29 Mot. 11-18.  He is mistaken.

At trial, the government introduced video footage of Powell firing a weapon in the yard of the gambling parlor.  GX 81-2.  A crime scene investigator recovered a .380 cartridge near the location where the video depicts Powell firing.  Tr. 178:11-181:1.  That evidence, on its own, was sufficient to support the felon-in-possession conviction.  *See United States v. Polk*, No. 20-864, 2023 WL 2637065, at *3 (2d Cir. Mar. 27, 2023) ("Law enforcement recovered ammunition casings from the scene, and the jury saw surveillance video footage of the shooting as well as photographs showing where the ammunition had been recovered.  This evidence was sufficient for the jury to conclude that Polk possessed ammunition.").  But the government also introduced a video taken seven weeks before the robbery in which Powell displays a weapon that he refers to as "my little .380," making it even more plausible that the .380 cartridge recovered at the scene belonged to him.  *See* GX 714B-1, 714-B-4, 714B-R-V2.

In addition to his sufficiency argument, Powell also makes two challenges to the jury instructions regarding the felon-in-possession of ammunition charge.  Powell cannot challenge jury instructions in a Rule 29 motion.  2A Charles Wright & Arthur Miller, *Fed. Prac. & Proc. Crim.* § 466 (4th ed. 2025) (evidentiary sufficiency is the only permissible basis for a Rule 29 motion).  But even if he could, Powell's instructional challenges would fail on their own terms.

*First*, Powell faults the Court for failing to instruct the jury that it had to reach a unanimous verdict as to *which* cartridge he possessed.  Powell Rule 29 Mot. 11-13.  In his view, the jury could have (for example) split 4-4-4, with each group of jurors concluding that he possessed a different cartridge.  This outcome, Powell argues, would violate the constitutional requirement of a unanimous verdict.  *Id.*

But Powell's argument elides the distinction between the "elements" of a crime and the "means" by which those elements are satisfied.  *See Richardson v. United States*, 526 U.S. 813, 817 (1999).  The requirement of a unanimous verdict does not mean that a jury must "decide unanimously which of several possible sets of underlying brute facts make up a particular element."  *Id.*  Take, for example, a robbery statute that requires the threat of force.  Jurors must unanimously

agree that the defendant threatened force — but they need not agree about the specific weapon he used.  *Id.*

While the Second Circuit has not addressed the specific unanimity issue raised here, *see United States v. Rivera*, 22-CR-201, 2025 WL 3227748, at *3 (D. Conn. Nov. 19, 2025), it has held that unanimity is not required in similar contexts.  For example, jurors deciding on a charge for possession of a schedule I controlled substance must agree only that the defendant possessed *some* schedule I controlled substance, not which one.  *United States v. Requena*, 980 F.3d 30, 51 (2d Cir. 2020); *see also United States v. Estevez*, 961 F.3d 519, 528 (2d Cir. 2020) (jury need not agree as to specific date(s) felon was in possession of firearm).  So too here, the jurors had to unanimously agree on the element of possession, but not the "brute facts" regarding which one or more of the bullets he possessed.

*Second*, Powell argues that the Court's instruction suggested to the jury that it had to find Powell possessed all three .380 cartridges identified in the indictment in order to convict on Count Five.  Powell Rule 29 Reply 20, ECF No. 337. Per Powell, because the government failed to "request an instruction clarifying that possession of just one cartridge was enough" it "assumed the burden of proving possession of each." *Id.*  But Powell cites no basis in federal law for the

proposition that the government can raise its own legal burden. If anything, Powell's argument implies that the jury instruction was *too favorable* to him, and the jury found him guilty anyway. *See United States v. Pimentel*, 83 F.3d 55, 60 (2d Cir. 1996) (error was harmless so long as verdict "necessarily meant that the jury found facts that constituted the offense").

## II.   The Rule 33 Motions

A court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  However, this authority must be exercised "sparingly and in the most extraordinary circumstances."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  The touchstone inquiry is whether "letting a guilty verdict stand would be a manifest injustice."  *Id.*

## A.   The Weight of the Evidence Does Not Require a New Trial

Powell's Rule 33 motion incorporates his evidentiary sufficiency arguments by reference to his Rule 29 motion.  *See generally* Powell Rule 33 Mot., ECF No. 331.  The Court therefore construes Powell's motion as seeking a new trial based on the weight of the evidence.

A court cannot grant a new trial "based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be a

manifest injustice to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020).  For the reasons outlined above, the evidence does not preponderate heavily against the jury verdict.  No new trial will be granted on this basis.

**B.    Powell's Remaining Arguments Do Not Justify a New Trial**

Powell's Rule 33 motion offers several additional arguments.  None of them carries the day.

1.    Powell's *Daubert* challenge fails

Powell argues that the Court should not have qualified the government's ballistics expert, Robert Bustamante, to offer opinion testimony under Federal Rule of Evidence 702.  Powell Rule 33 Mot. 2.  Powell baldly asserts that Bustamente's testimony at trial was "inconsistent with his own . . . methodology." *Id.*  But Powell does not actually articulate any issue with Bustamante's methodology.  Instead, he argues that Bustamante's testimony should have been excluded because he could not produce conclusive results as to the third shell casing.  *See* Powell Rule 33 Reply 2-3, ECF No. 338.  That is not a proper basis for exclusion under *Daubert*.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("The focus . . . must be solely on principles and methodology, not on the conclusions that they generate.").

14

2.  Powell's *Bruton* challenge fails

Powell asserts that the admission of the taped conversation between CW-1 and Castro — in which Castro describes Powell's involvement in the robbery, *see* GX 251-T-A, at 5 — violated *Bruton v. United States*.[9]  Powell Rule 33 Mot. 2-3. Under *Bruton*, a court may not admit a defendant's confession at a joint trial if the statement implicates a co-defendant.  391 U.S. 123, 126 (1968).  Crucially, however, *Bruton* applies only to testimonial statements.  *United States v. Williams*, 506 F.3d 151, 157 (2d Cir. 2007); *see also* 2 Wharton's Crim. Evid. § 8:19 n.15 (15th ed. 2025) ("[E]very federal circuit to consider the issue has concluded that . . . [a] co-defendant's statement would have to be found to be testimonial before *Bruton* would be implicated.").  And a statement made by a declarant who is unaware that he is speaking to a government informant is non-testimonial.  *See United States v. Saget*, 377 F.3d 223, 228-29 (2d Cir. 2004) (The "determinative factor" is "the declarant's awareness or expectation that his . . . statements may later be used at a trial.").  So, *Bruton* does not apply here.  *United States v. Tyrell*, 840 F. App'x 617, 623 (2d Cir. 2021).

---

[9] The Court already rejected this argument in a prior order.  See Order on Motions *in Limine* 9, ECF No. 244.

1.  Powell's challenge to the government's summation
    <u>fails</u>

Powell also argues that the government's summation was improper because the prosecutor (1) said that the gambling parlor had "out-of-state connections," and (2) "urged the jury to credit Brian Castro's account of stealing over $20,000" and dividing it among his co-defendants in equal shares.  Powell Rule 33 Mot. 4-5.

The first statement was proper.  "So long as a prosecutor does not misstate the evidence, he or she is entitled to wide latitude during closing arguments."  *United States v. Rainford*, 110 F.4th 455, 473 (2d Cir. 2024).  As already noted, the jury heard evidence that the gambling parlor purchased products that were brewed and bottled outside New York State — Guinness beer, Casamigos tequila, and Heineken beer.  Tr. 980:25-983:3, 1030:14-1031:8.  So, the prosecutor did not misstate the evidence.

The second statement was also proper.  A prosecutor is "entitled to argue forcefully and vigorously . . . in support of her witness's credibility . . . based on evidence in the record."  *United States v. Spinelli*, 551 F.3d 159, 169 (2d Cir. 2008).  Here, the prosecutor urged the jury to credit Castro's testimony about dividing the stolen money into shares of $5,800, because that figure was (in her view) "too specific to not be

true." Tr. 1954:13-14. In other words, the prosecutor appealed to the jury's "common sense," rather than to extra-record evidence. *Id.* Because jurors are "entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences," *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008), this appeal was permissible.

2. Powell's jury-instruction challenge fails

Finally, Powell argues that the Court improperly instructed the jury regarding the effect on interstate commerce that is necessary to sustain a Hobbs Act conviction. Powell Rule 33 Mot. 3-4. He takes issue with the following sentence: "If you decide that interstate or foreign commerce would have been affected if . . . a defendant successfully and fully completed his actions, then the element [of] affecting interstate or foreign commerce is satisfied." Tr. 2025:14-17. According to Powell, this instruction impermissibly implied that a potential effect on interstate commerce, rather than an actual one, was sufficient to support a conviction.

There are two problems with that contention. *First*, the Court's instruction on Hobbs Act robbery *did* require an actual effect on commerce. The instruction quoted by Powell requires the jury to find (1) that the robbery was completed, and (2) that the completed robbery would necessarily have affected interstate commerce. Indeed, the preceding paragraph

17

makes this clear.  There, the Court said that the government
"must prove . . . that the robbery affected interstate or
foreign commerce in any way or degree." Tr. 2025:4-6.  This
sentence clearly describes an actual effect, not a potential
one.

> *Second*, even if the Court had instructed the jury that
a potential effect on interstate commerce was sufficient, such
an instruction would have been legally correct.  It is settled
law in this circuit that "if the defendants' conduct produces
any interference with or effect upon interstate commerce,
whether slight, subtle *or even potential*, it is sufficient to
uphold a prosecution under the Hobbs Act." *United States v.
Silverio*, 335 F.3d 183, 186 (2d Cir. 2003) (emphasis added).
Thus, the challenged jury instruction was, if anything, *too*
favorable to Powell.  It therefore cannot have prejudiced him.

## C.    Later-Discovered Evidence About CW-1's Staged Shooting Does Not Justify a New Trial

> Coward argues that he is entitled to a new trial
because of later-discovered evidence about the shooting of one
of the government's cooperating witnesses ("CW-1").  At trial,
CW-1 testified to the authenticity and contents of a recorded
conversation he had with Castro (in which Castro described the
defendants' involvement in the robbery) and the relationships
among the defendants. *E.g.*, Tr. 1540:10-1541:25 (authenticating

18

recording); 1549:10-1553:3 (testifying about prior drug dealing between Coward and Castro).

During trial, but before CW-1 testified, the government informed the Court and defense counsel that CW-1 had been shot in the leg by masked men who accused him of being a "rat." *See* ECF No. 245, at 1. The government stated that it did "not intend to elicit testimony about the shooting [from CW-1], but if the door is opened, the witness will be prepared to testify truthfully." Tr. 1508:13-15. Defense counsel also did not elicit testimony about the shooting on cross-examination.[10] After trial concluded, on February 7, FBI agents interviewed two individuals who confessed to staging the shooting at the behest of CW-1 himself, and said CW-1 had arranged the episode to avoid testifying at trial. ECF No. 307, at 2-3. The government disclosed this information to the Court and to defense counsel in a letter dated February 20. *Id.*

In his Rule 33 motion, Coward argues that this revelation justifies a new trial, because (1) CW-1 "accused Mr. Coward of trying to kill him to prevent him from testifying at Mr. Coward's trial," and (2) defense counsel was unable to

---

[10] While CW-1 was still injured at the time and could not walk without assistance, the Court took steps to prevent the jury from learning of his injuries by seating him on the witness stand before the jury entered the courtroom. *See* Tr. 1508:16-1511:3.

cross-examine CW-1 about it.  Coward Rule 33 Mot. 4-5, ECF No.
329.  Both arguments fail.

### 3. Defendants have identified no evidence that CW-1 perjured himself

First, Coward cites several cases for the proposition
that a jury "probably would have altered its verdict" had it
known of a witness's perjury.  *See* Coward Rule 33 Mot. 4-6.  But
while CW-1 may have lied to law enforcement — outside of court —
about orchestrating his own shooting, there is no evidence that
he perjured himself at trial.  CW-1 never mentioned the shooting
in his testimony, nor did the government or defense counsel
broach the subject during their examinations.  *See* Tr. 1508:13-
15.  So, CW-1 did not perjuriously accuse Coward of involvement
in any assassination attempt.[11]

### 4. Cross-examination about the staged shooting would not have altered the outcome of trial

Coward's other argument in favor of a new trial
relates to his inability to sufficiently to cross-examine CW-1.
From the face of his motion, it is not entirely clear what he
means when he says that his counsel "let [CW-1's] . . .
testimony to go to the jury unchallenged."  Coward Rule 33
Motion 2.  Defense counsel, including Coward's own counsel,

---

[11] Coward also offers no support for the proposition that CW-1 accused
*him* of attempted assassination, perjuriously or otherwise.  Instead, he
clarifies in his reply brief that this would have been "the jury's natural
inference, given the timing of the shooting."  Coward Rule 33 Reply 2, ECF
No. 340.  But, again, the jury never learned of the shooting in the first
place.

cross-examined CW-1 on other topics.[12]  And Coward does not
identify any way his counsel held back, apart from not asking
about the shooting incident itself.  Accordingly, the Court
understands Coward's objection to be related solely to his
inability to question CW-1 about the staged shooting: when
Coward's counsel cross-examined CW-1, (1) the shooting had
happened; and (2) CW-1 had lied about it; but (3) those lies
were not yet known to the government (or, by extension, defense
counsel).

       When a defendant moves for a new trial based on newly
discovered evidence, he must show that:

              (1) the evidence was newly discovered after
              trial; (2) facts are alleged from which the court
              can infer due diligence on the part of the movant
              to obtain the evidence; (3) the evidence is
              material; (4) the evidence is not merely
              cumulative or impeaching; and (5) the evidence
              would likely result in an acquittal.

*United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015).
Coward does not satisfy this standard.

       Evidence that "merely discredits a government witness
and does not directly contradict the government's case
ordinarily does not justify the grant of a new trial."  *United*

---

[12] Coward's reply brief seems to suggest in several places that his
counsel was unable to cross-examine CW-1 *at all* for fear that doing so would
elicit testimony regarding the shooting.  *See, e.g.*, Coward Rule 33 Reply 1
("To avoid this outsized risk, defense counsel did not cross examine [CW-
1].").  That is untrue.  See Tr. 1613:14-25 (beginning of Ms. Shroff's cross-
examination).

*States v. Spencer*, 4 F.3d 115, 119 (2d Cir. 1993). And here, CW-1's credibility was relatively inconsequential to the government's case. The prosecution's primary purpose in calling CW-1 as a witness was to have him authenticate the recording of Castro's confession. Once the government hit play on that recording, CW-1's credibility became largely irrelevant. It was Castro's confession, not CW-1's testimony, that was "devastating to Mr. Coward's defense." Coward Rule 33 Motion 2. Because impeachment evidence regarding the staged shooting "would [not] have undermined a critical element of the prosecution's case," it is immaterial. *United States v. Wong*, 78 F.3d 73, 79 (1996). Particularly when viewed in conjunction with the government's other evidence — such as Myhand's testimony, video footage of the robbery, cell-site location data, and text messages between the co-defendants — it cannot warrant a new trial.[13]

---

[13] Moreover, it is hard to imagine that testimony about the staged shooting would have been categorically beneficial to the defendants, given that CW-1 admitted to having shot himself out of fear of the defendants themselves. *See generally* ECF No. 307.

### III. Conclusion

For the foregoing reasons, the defendants' motions for a judgment of acquittal and for a new trial are denied.


SO ORDERED.



                       /s/ Eric Komitee
                      ERIC KOMITEE
                      United States District Judge


Dated:    January 21, 2026
          Brooklyn, New York